# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| XRI INVESTMENT HOLDINGS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0619-JTL |
| | ) | |
| GREGORY A. HOLIFIELD and GH | ) | |
| BLUE HOLDINGS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION ADDRESSING ISSUES ON REMAND

Date Submitted: July 11, 2024
Date Decided: July 24, 2024

A. Thompson Bayliss, Samuel D. Cordle, Eric A. Veres, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Angela C. Zambrano, Yolanda Cornejo Garcia, Margaret Hope Allen, SIDLEY AUSTIN LLP, Dallas, Texas; Robin Wechkin, SIDLEY AUSTIN LLP, Issaquah, Washington; *Attorneys for Plaintiff.*

Michael W. McDermott, Richard I. G. Jones, Jr., David B. Anthony, Zachary J. Schnapp, BERGER MCDERMOTT LLP, Wilmington, Delaware; *Attorneys for Defendants.*

**LASTER, V.C.**

The court issued a post-trial decision.[1] Both sides appealed. The Delaware Supreme Court affirmed in part, reversed in part, and remanded for the court to address additional issues.[2] This post-remand opinion addresses those issues. It finds that the plaintiff is entitled to damages of $4,166,554.58 for the defendant's breach of the LLC Agreement. The breach was willful, entitling the plaintiff to recoup the amount of expenses it advanced for this litigation.[3] The amount of the recoupment is $1,969,791.50 as of November 30, 2023, plus all amounts that the plaintiff subsequently advanced for this case. The parties will confer regarding a specific amount.

## I. FACTUAL BACKGROUND

The factual background comes almost entirely from the *Post-Trial Opinion*. To the extent the issues on remand have required factual findings on issues not

---

[1] *XRI Inv. Hldgs. LLC v. Holifield (Post-Trial Opinion)*, 283 A.3d 581, 590 (Del. Ch.), *aff'd in part, rev'd in part and remanded*, 304 A.3d 896 (Del. 2023). Capitalized terms not defined here are used as defined in the *Post-Trial Opinion*.

[2] *Holifield v. XRI Inv. Hldgs. LLC (Supreme Court Opinion)*, 304 A.3d 896 (Del. 2023).

[3] This decision uses the term "expenses" to refer collectively both to attorneys' fees and amounts paid out of pocket that might more colloquially be called expenses. That is how Section 145 of the Delaware General Corporation Law deploys the term. *See, e.g.*, 8 *Del. C.* § 145(a) (authorizing a corporation in a proceeding other than one brought by or in the right of the corporation to provide indemnification "against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred"). The concept of out-of-pocket expenses includes more than the restricted concept of "costs" under the statute that authorizes the recovery of court costs. *See* 10 *Del. C.* § 5106; *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 686–88 (Del. 2013).

addressed in the *Post-Trial Opinion*, those findings are based on the trial record and the supplemental materials the parties submitted.

**A.     Holifield And Gabriel Form XRI As Part Of A Broader Partnership.**

XRI Investment Holdings LLC ("XRI" or the "Company") is a full-cycle water recycling and midstream infrastructure company servicing the energy exploration and production industry. In 2013, Gregory Holifield and Matthew Gabriel co-founded XRI's predecessor. Holifield and Gabriel also pursued other business opportunities.

Holifield and Gabriel brought complementary skills to their partnership. Holifield is a scientist with a doctorate in computer engineering. He is also a veteran of the United States Army, having served as an infantry officer, an Explosives Ordinance Disposal officer, and a uniformed scientist.

Gabriel is a former attorney who spent the majority of his legal career at Kirkland & Ellis LLP. While there, Gabriel practiced corporate law with an emphasis on private equity transactions. Gabriel left the practice of law to join a venture capital client. Through these roles, Gabriel gained considerable experience structuring deals.

In addition to forming operating entities, Holifield and Gabriel formed Entia LLC as a services company to provide management services and personnel to their operating businesses. Holifield controlled Entia, and Gabriel owned a minority stake. Entia itself did not own interests in any operating businesses; Holifield and Gabriel owned those personally.

**B.      Holifield And Gabriel Sell A Controlling Interest To Morgan Stanley.**

In August 2016, Holifield and Gabriel sold a controlling interest in XRI's predecessor to funds affiliated with Morgan Stanley. XRI emerged from the Morgan Stanley Sale in its current incarnation as a manager-managed Delaware limited liability company with its internal affairs governed by a limited liability company agreement (the "LLC Agreement").

Under the LLC Agreement, Morgan Stanley was designated as the Class A member and received Class A units. Holifield and Gabriel were designated as the Class B members and received Class B units. Holifield's Class B units are the Disputed Units. The LLC Agreement established a five-member Board of Representatives (the "Board") to manage the entity. As the sole Class A member, Morgan Stanley had the right to designate three Board members. It named three Morgan Stanley employees: Logan Burt, Mark Bye, and John Moon. The Class B members had the right to designate two Board members. Gabriel and Holifield designated themselves.

As part of the Morgan Stanley Sale, Entia received an infusion of capital. It was structured as a loan from XRI to Entia and documented by a secured promissory note (the "XRI Note"). The loan contemplated a single balloon payment of $10,611,356.88, plus accrued interest, due on August 8, 2020. Holifield executed a personal guaranty in favor of XRI. Holifield also executed a Unit Pledge Agreement, in which Holifield pledged all of the Disputed Units as security for the XRI Note and his guaranty. XRI filed a UCC-1 financing statement with the State of Florida on

August 8, 2016, identifying Holifield as the debtor, XRI as the secured party, and the Disputed Units as the collateral for the XRI Note.

After the Morgan Stanley Sale, Gabriel became CEO of XRI. By becoming CEO, Gabriel achieved a personal goal, and he was proud to be working for Morgan Stanley.

The sale of a controlling interest in XRI was a boon to Seth Ellis, the managing partner of a private investment firm that provides capital to middle-market companies. XRI had obtained a $5 million loan from Penta Mezzanine Fund, which Ellis's firm managed. Holifield and Gabriel used a portion of the proceeds from the Morgan Stanley Sale to repay the loan, and Ellis's firm achieved a return of 65% within ten months. The successful investment cemented a strong professional relationship among Ellis, Gabriel, and Holifield.

## C. Gabriel Helps Holifield Seek Capital For Entia.

In early 2018, Holifield wanted to raise $3.5 million through Entia to fund some of the operating businesses that he and Gabriel owned. Gabriel worked with Holifield to find ways to raise the capital.

During this period, Holifield and Gabriel had frequent discussions about XRI, Entia, their other portfolio companies, and how to raise capital. At trial, Gabriel claimed that during this period, the frequency of his conversations with Holifield was diminishing rapidly. That testimony was not credible and reflected Gabriel's effort throughout the litigation to distance himself from Holifield and align himself with Morgan Stanley.

To help with the capital-raising process, Gabriel assigned all of his interests in Entia to Holifield for one dollar. Gabriel gave up his equity because he believed Entia was in financial distress, and he thought Holifield could raise raising capital more easily as the sole owner of Entia.

More significantly, Gabriel helped Holifield explore how to use the Disputed Units to raise capital. In April 2018, Gabriel spoke with Burt and Moon, two of the Morgan Stanley representatives on the Board, about Morgan Stanley buying some or all of the Disputed Units. After socializing the idea with Morgan Stanley, Gabriel told Holifield to contact Burt and helped him prepare for the call. Holifield subsequently engaged with Burt, but the two could not agree on a price.

After the conversation with Morgan Stanley went nowhere, Gabriel explored purchasing some of the Disputed Units himself. Gabriel asked Moon whether Morgan Stanley would support the purchase. When Moon was cool to the idea, Gabriel dropped it.

Gabriel and Holifield also considered another loan from Ellis. Holifield contacted Ellis, and in early May 2018, Ellis raised the topic with Gabriel. During a meeting on May 8, Gabriel told Ellis that Holifield had gotten overextended financially and needed help for some of his other businesses. Ellis had the impression that Gabriel wanted Ellis to help.

To further support Holifield's efforts, Gabriel prepared a detailed spreadsheet that included a capitalization table for XRI, noted Holifield's $20 million capital account, identified the XRI Note, and modeled potential exit scenarios at valuations

5

ranging from $250 million to $600 million. Gabriel's spreadsheet showed that the Disputed Units had substantial value in excess of the amount due on the XRI Note.

### D. Burt Tells Holifield To Keep Any Transaction On His "Side Of The Ledger."

Holifield and Ellis decided to move forward with a loan to Entia from Assurance Mezzanine Fund III, a fund Ellis managed (respectively, the "Assurance Loan" and "Assurance"). Ellis viewed the Disputed Units as an important source of collateral and wanted some form of security interest in them. Holifield knew that the Disputed Units already provided security for the XRI Note and that Morgan Stanley would reject any transaction structure that impaired XRI's rights.

Gabriel worked with Holifield to brainstorm ways to structure an arrangement that would be acceptable to Morgan Stanley and Assurance. Their initial plan was for Holifield to grant Assurance a security interest in the Disputed Units that would be junior to the XRI Note. Holifield and Gabriel agreed that Gabriel would preview the concept with Morgan Stanley.

After Gabriel socialized the idea, Holifield called Burt. Under the LLC Agreement, any formal pledge of the Disputed Units required Board approval, and Holifield asked Burt to have the Board sign off. A few days later, Burt told Holifield that the Board was unlikely to approve his idea. But Burt also reassured Holifield that Morgan Stanley was not attempting to interfere with his efforts to raise capital for Entia.

Holifield then asked Burt if Morgan Stanley would support a loan if he "could set something up where [they] completely isolated the loan . . . without affecting the

6

interest, pledging the interest directly."[4] Burt told Holifield that as long as he kept the arrangement "on [his] side of the ledger," then Morgan Stanley "didn't care."[5] Holifield understood Burt to be saying that as long as he could set up a structure in which there was no direct pledge of the units themselves, and Holifield kept all of the risk that was associated with the loan, then Morgan Stanley would be satisfied. That was a reasonable interpretation.

## E. The New Structure

After the call with Burt, Gabriel and Holifield brainstormed structures that would keep a loan on Holifield's side of the ledger.

One necessary implication of Burt's comment was that Morgan Stanley would not object if Holifield borrowed the amounts personally, without giving Assurance any security interest specific to the Disputed Units, such that Assurance became a general creditor of Holifield. Unless Morgan Stanley was okay with that outcome, there was no way for Holifield to satisfy Morgan Stanley. Under the general creditor scenario, any rights that Assurance received would be unsecured. In that scenario, Assurance would have rights on par with Holifield's other general creditors. Like those creditors, Assurance could pursue Holifield and his assets in the event of a default. And like Holifield's general creditors, Assurance could seek a charging order

---

[4] *Post-Trial Op.*, 283 A.3d at 597.

[5] *Id.*

7

against the Disputed Units, which is the *exclusive* remedy that a judgment creditor can obtain under Delaware law.[6] But the XRI Note aways would have priority.

Gabriel and Holifield did not think that Assurance would want to be on the same level as Holifield's other general creditors, so they discussed whether Holifield could provide Assurance with an earmarked right to the net proceeds of any sale of the Disputed Units, but only *after* Holifield received them. Limiting Assurance to the net proceeds after repaying the XRI Note was critical. In his deposition, Holifield recalled Gabriel telling him that he could not secure a loan with the proceeds generally.[7] Such an arrangement would conflict with XRI's rights.

The net-proceeds concept was different. Under that arrangement, Assurance would not receive any rights in the Disputed Units per se, but if a sale of the units resulted in Holifield receiving money, then Assurance would have a right to that

---

[6] *See* 6 *Del. C.* § 18-703(d) ("The entry of a charging order is the exclusive remedy by which a judgment creditor of a member or a member's assignee may satisfy a judgment out of the judgment debtor's limited liability company interest . . . ."); Robert L. Symonds, Jr. & Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies* § 5.21[C], at 5-88 (2d ed. 2019) ("The DLLC Act states expressly that the entry of a charging order is the exclusive remedy by which a judgment creditor of a member or of an assignee may satisfy a judgment out of the judgment debtor's limited liability company interest."). The implications of this limited remedy for purposes of asset protection are well understood and explained at length elsewhere. *See generally* Jay D. Adkisson, *The Charging Orders Practice Guide: Understanding Judgment Creditor Rights Against LLC Members* (2018); Jay D. Adkisson, *Charging Orders: The Peculiar Mechanism*, 61 S.D. L. Rev. 440 (2016); Carter G. Bishop, *LLC Charging Orders: A Jurisdictional & Governing Law Quagmire*, 12 No. 3 Bus. Entities 14 (2010).

[7] Holifield Dep. 60, 70.

8

money once it ended up in Holifield's pocket. Gabriel and Holifield decided that the structure would work under the LLC Agreement. But Gabriel thought Assurance would never go for it because once the cash reached Holifield's pocket, it would be a fungible part of Holifield's assets and available to any creditor, not just Assurance.

Gabriel and Holifield therefore began to brainstorm about whether there was a way to elevate Assurance's claim above Holifield's other general creditors, without threatening XRI's rights. Holifield's counsel thought of isolating the Disputed Units in a special purpose vehicle ("SPV"), such as a newly formed LLC, then having the SPV borrow from Assurance. Assurance would not receive any security interest in the Disputed Units; instead, Assurance would remain a general creditor of the SPV. But as long as Assurance was the *only* general creditor of the SPV, Assurance would have priority over Holifield's other general creditors for purposes of any net proceeds that the SPV received, after the payment of the XRI Note.

In short, by placing the units in the SPV, Holifield would structurally subordinate the claims of his other general creditors. XRI would be unaffected, because XRI would continue to enjoy its exclusive status as the only secured creditor with a perfected security interest in the Disputed Units. If anything, XRI would benefit, because the structural subordination of Holifield's other creditors would benefit XRI as well. Meanwhile, Assurance would end up in an intermediate position between XRI and Holifield's other creditors, but without receiving a separate security interest in the Disputed Units that XRI would need to approve.

9

For purposes of a loan to Entia, Entia needed to be the borrower, not the SPV. The solution was for the SPV to promise to pay over to Entia any net proceeds that the SPV received from a sale of the Disputed Units, putting Entia (rather than Assurance) in the structurally senior position relative to Holifield's other general creditors. Entia, in turn, would grant Assurance a security interest in its assets, including its contractual right to receive any net proceeds generated by a sale of the Disputed Units. Relative to any general creditors of Entia or Holifield, Assurance would have the priority claim on Entia's rights, but no claim on the Disputed Units. As a backstop, Holifield and the SPV would guarantee the repayment of the Assurance Loan. XRI would continue to enjoy its exclusive status as the only secured creditor with an interest in the Disputed Units.

On May 24, 2018, Holifield's counsel[8] sent an email to Assurance's counsel that described the concept they had developed:

> [Holifield] would transfer his XRI equity into a new limited purpose SPV and we would get the requisite consents and docs executed to effect [sic] that transfer under the XRI loan docs and XRI LLC Agreement (where it's a Permitted Transfer). Assurance would loan $3.5mm to Entia, secured by an all assets pledge at Entia and the attached Guaranty by [Holifield]. SPV would assign its rights to the proceeds of the XRI equity to Entia. When XRI is sold, the proceeds would first repay XRI in satisfaction of its note and lien on the XRI equity, and the remainder would be transferred to Entia to repay Assurance.[9]

---

[8] Technically, the lawyers were representing Entia, but the distinction is not important for this decision.

[9] *Post-Trial Op.*, 283 A.3d at 600 (quoting JX 27).

10

The reference to a "Permitted Transfer" recognized that the LLC Agreement entitled Holifield to transfer the Disputed Units to a wholly owned affiliate for purposes of estate planning.[10]

Through this structure, Holifield and his counsel believed that they would keep the transaction on Holifield's side of the ledger, just as Morgan Stanley wanted. XRI's rights would be preserved, and XRI would be no differently situated than if no transfer of the Disputed Units had taken place and Assurance had made an unsecured loan to Holifield personally. Relative to Holifield's other general creditors, however, Assurance would gain a priority in any net proceeds from a sale of the Disputed Units, after full payment of the XRI Note. Relative to XRI, Assurance would remain a junior creditor, and its claim would be unsecured.

## F. The Idea Of The Blue Transfer

After coming up with the structure, Holifield told Gabriel that he planned to obtain additional capital from Assurance. He also told Gabriel that he planned to transfer the Disputed Units to Blue. Gabriel thus knew the basics of what Holifield had planned.

Holifield subsequently told Burt that he was making the transfer for estate planning purposes and that he planned to exercise rights available to him under the documents without a request for board approval. As XRI has stressed repeatedly during this litigation, Holifield was not fully candid. Placing the Disputed Units in

---

[10] *Id.* (citing LLCA § 8.01(a)(iii)).

an SPV would enhance Holifield's ability to engage in estate planning, but the specific impetus for placing the Disputed Units in an SPV was to facilitate the Assurance Loan. Holifield had not planned to transfer the Disputed Units to an SPV separate and apart from the Assurance Loan, and he never created any formal estate plan.

On May 29, 2018, Holifield's counsel sent an email to Assurance's counsel, copying Ellis, Holifield, and other members of the deal team. The email addressed what language to include in the governing documents for Blue. In connection with any Permitted Transfer, the LLC Agreement required that both the transferring member and the Permitted Transferee "execute documentation reasonably acceptable to the Board documenting such Transfer, which may include provisions giving rights of approval with respect to amendments of the governing documents and material contracts (to the extent relating to the relevant Units or other Company Interests) of the Permitted Transferee to the Company."[11]

The LLC agreement for Blue was a "material contract" that Holifield would have to provide to XRI in connection with a Permitted Transfer. Holifield and his counsel debated whether the LLC agreement for Blue should include language documenting that Entia was entitled to receive the net proceeds from a sale of the Disputed Units, after satisfaction of the XRI Note. Holifield's counsel feared that if the LLC agreement for Blue specifically called out this arrangement, then Morgan Stanley or XRI might slow down the process with questions on issues that ultimately

---

[11] LLCA § 8.01(e).

did not concern them. Holifield's counsel reasoned that because the arrangement did not affect XRI's side of the ledger, there was no need for disclosure. Holifield's counsel thus recommended that the LLC agreement not say anything about Entia's right to the net proceeds from a sale of the Disputed Units.[12]

Throughout this litigation, XRI has contended that the email from Holifield's lawyer about not referencing Entia's right to net proceeds in the LLC Agreement, coming fast on the heels of Holifield's statement to Burt about estate planning. demonstrates that Holifield and his counsel sought to defraud XRI. That is one possible interpretation of the evidence. but after seeing Holifield testify live, that was not my view.

Taking the issues in reverse order, the *Post-Trial Opinion* found that Holifield and his counsel had a reasonable belief, held in good faith, that they had created a mechanism that did not affect XRI's side of the ledger.[13] They also believed, based on Burt's comment to Holifield, that Morgan Stanley did not want XRI to be involved in Holifield's efforts to raise capital. Based on interactions with Burt and Gabriel, Holifield and his counsel decided not to include information that they believed would slow down the transaction, but ultimately not affect the deal's structure.

Holifield and his counsel could have made a different choice and been completely transparent. In hindsight, that would have been preferable. But parties

---

[12] *Post-Trial Op.*, 283 A.3d at 601 (citing JX 28).

[13] *Id.* at 601.

and their lawyers often seek to limit what information they provide to a counterparty, particularly when they view the information as something the counterparty does not need to know and fear that providing it could prompt a time-consuming discursion.

Holifield's misrepresentation about estate planning is more difficult to explain, and the *Post-Trial Opinion* did not try. As discussed more fully below, the *Post-Trial Opinion* did not proceed in the belief that Holifield had acted properly, nor in the belief that the Assurance Loan complied with the LLC Agreement. To the contrary, the *Post-Trial Opinion* held that Holifield breached the No Transfer Provision. What the *Post-Trial Opinion* found disquieting and inequitable was not based on Holifield behaving well and XRI behaving badly; it was based on a court of equity's inability to apply an equitable defense like acquiescence where it seemed called for.

## G.    Informing Morgan Stanley

On May 30, 2018, Holifield's counsel sent Holifield an email that attached a set of proposed documents that would transfer the Disputed Units to Blue while preserving all of XRI's rights as a secured creditor. Holifield forwarded the email with attachments to Gabriel. Gabriel then forwarded it to Burt, commenting that it seemed "well thought through by counsel."[14] Gabriel had been in the loop, and he advocated for the transaction.

---

[14] *Id.* at 602 (first citing PTO ¶ 37; then citing JX 31; and then citing Gabriel Tr. 80, 123).

Burt forwarded the emails to XRI's lawyers. On June 5, 2018, after conferring with the Board and counsel, Gabriel signed off on the transaction. When he did so, Gabriel knew that Holifield was obtaining a loan from Assurance based on the net proceeds that would be available after any sale of the Disputed Units.

As expected, XRI and Morgan Stanley wanted to limit their involvement and only see the documents that they needed to sign. To that end, Gabriel told Holifield to limit the documents that XRI is signing to what was strictly required. In fact, the idea to give Assurance the right to net proceeds had been Gabriel's idea.

Holifield forwarded Gabriel's email to his counsel. She responded that "it's ok to sign the 3 XRI docs and get [Gabriel] to countersign the Pledge Agreement. They're all dated tomorrow but *there's no real uncertainty about closing Assurance* and even if it fell through you'd still have an SPV structure which is preferable to you personally."[15]

The following day, Holifield forwarded his lawyer's email to Gabriel with revised versions of the identified documents, as well as a signed copy of the Unit Pledge Agreement under which Blue pledged its ownership interest in the Disputed Units as security for the XRI Note. The forwarded email included the full email from Holifield's counsel, including the statement that "there's no real uncertainty about closing Assurance."

---

[15] JX 39 (emphasis added).

In a later email on June 6, 2018, Holifield sent Gabriel executed copies of the following additional documents: (i) a Contribution, Assignment and Assumption Agreement executed by Holifield and Blue, (ii) a guaranty executed by Blue for the XRI Note, and (iii) a UCC-1 Financing Statement identifying Blue as the debtor. Holifield also confirmed that his personal guarantee remained in force.

That same day, the Assurance Loan closed. Neither Holifield nor his counsel provided the Assurance Loan Documents to XRI until April 2019, when XRI requested them. In this litigation, XRI has claimed that Holifield and his counsel hid the documents from XRI. Holifield and his counsel, however, testified persuasively that they believed—reasonably and in good faith—that they had created a mechanism that did not affect XRI's rights. They also believed, based on Burt's comment to Holifield about keeping any transaction on his side of the ledger and Gabriel's comment about XRI not wanting to sign any documents that XRI was not required to approve, that Morgan Stanley did not want XRI to be involved in any capital-raising efforts by Holifield, unless its approval was contractually required. Based on their live testimony, the *Post-Trial Opinion* found that Holifield and his counsel made a good faith decision not to provide documents to XRI that they believed XRI did not want or need to see.

On June 13, 2018, Ellis informed Gabriel by email that the loan had closed. Gabriel did not express surprise. He did not follow up with Ellis or ask for any relevant details or documents. He also did not inform Burt, the Board, or XRI's counsel that the Assurance Loan had closed. He acted like someone who was already

16

in the loop, understood what was going on, and regarded the information as neither surprising nor disturbing.

Over the following months, Gabriel emphasized his role in helping Holifield secure financing for Entia as part of his efforts to convince Holifield to restore the equity interest in Entia that Gabriel had transferred to Holifield for one dollar. Holifield ultimately agreed.

## H.    Entia Needs More Capital.

In early March 2019, Entia needed yet more capital. As he had done in 2018, Holifield asked Gabriel whether XRI might purchase some of his units. As in 2018, Gabriel told Holifield to approach Morgan Stanley.

On March 7, 2019, Holifield drafted an email to Burt about his desire to sell his equity in XRI. Gabriel edited the email to remove any references to himself. Holifield sent the email with Gabriel's edits to Burt. Holifield and Burt subsequently had a series of discussions. As in 2018, they were unable to reach an agreement on the terms.

As in 2018, another possibility was for Gabriel to purchase some of the Disputed Units himself. Gabriel did not have funds readily available for that purpose, but Holifield suggested that Assurance could loan Gabriel the money to purchase some of the Disputed Units using a structure that was similar to the Assurance Loan. Ellis also spoke with Gabriel about the structure of the Assurance Loan.

Gabriel claimed that as a result of those discussions, he became concerned that the Blue Transfer and the Assurance Loan violated the LLC Agreement. Gabriel told Holifield that he intended to inform the Board about his concerns.

The *Post-Trial Opinion* found that Gabriel had always known there was risk that Morgan Stanley might object to the Blue Transfer and the Assurance Loan. By this point, he valued his relationship with Morgan Stanley more than his relationship with Holifield, and he concluded that his own interests were best served by playing the whistleblower and telling Morgan Stanley about the Assurance Loan.

Between March 22 and April 1, 2019, Gabriel sent XRI's outside counsel the emails he received in May and June 2018 from Holifield and Assurance about the formation of Blue and the Blue Transfer. On April 12, 2019, the XRI lawyers sent Holifield a letter in which they asserted that the Blue Transfer could violate the LLC Agreement. XRI's counsel asked for all of the loan documentation.

Holifield was surprised by the April 12 letter. Because Gabriel had been involved in the transaction all along, Holifield thought that XRI and Morgan Stanley knew about the transaction and did not object. Holifield and his counsel believed that Morgan Stanley was making a play to acquire the Disputed Units. But after some internal deliberation, Holifield and his counsel sent the documents to XRI's counsel.

Between April 18 and May 6, 2019, XRI's lawyers reviewed the documents for the Assurance Loan. During the review, XRI's lawyers came believe strongly that the Assurance Loan violated the LLC Agreement.

18

On May 6, 2019, XRI's lawyers informed Holifield that XRI was continuing to review the situation. XRI reserved its rights but did not take any further action. Instead, Morgan Stanley made a business judgment that it wasn't worth the hassle and legal expense to pursue.

## I.      Holifield Defaults On The XRI Note.

Over the following months, Entia's financial position worsened. By the end of 2019, Entia was unable to pay its debts as they came due. By that point, multiple lawsuits had been filed against Entia and Holifield for unpaid debts.

The XRI Note would mature on August 8, 2020. As the date approached, Burt and Holifield began to discuss the need for repayment. Holifield expressed concern about his ability to pay. Holifield and Burt discussed possible compromises, but the discussions broke down after Burt threatened that if Holifield did not agree to a deal, then XRI could simply take the Disputed Units.

On August 8, 2020, the XRI Note came due. Holifield did not pay, resulting in a default.

On August 12, 2020, XRI's lawyers sent Holifield a letter, transmitted by email, that notified him of the default. They sent the letter to a building in Lake Mary, Florida, that Holifield and Gabriel previously owned and had used as Entia's headquarters. But as Gabriel knew, that building had been sold, and Entia had vacated it eight months earlier in January 2020.

XRI's lawyers also sent the letter by email. Holifield immediately responded and provided two addresses for future correspondence. One was his home in Eustis.

19

The other was for Entia's office in Sanford, Florida. Holifield also objected to any effort by XRI to foreclose on the units without taking commercially reasonable steps.

**J.     The Strict Foreclosure**

XRI claims that at some unidentified point in October 2020, the Board decided that the Blue Transfer was invalid and that the proper course of action was to engage in a strict foreclosure of the Disputed Units. The Morgan Stanley representatives and Gabriel intentionally decided not to create any written record of their decision. Holifield was a member of the Board at that time, but not one invited him to the meeting or told him about the decision.

On October 16, 2020, XRI's lawyers delivered a letter by Federal Express ("FedEx") to Holifield at the defunct Lake Mary address. This time, XRI did not email a copy to Holifield, as it had with its August 12 letter. XRI did not attempt to provide Holifield with notice at any other address either. Holifield was in California on October 16, 2020, and he never received the FedEx.

In the October 16, 2020 letter, XRI made a proposal to Holifield to accept the Disputed Units in full satisfaction of the XRI Note (the "Letter Proposal"). Under the UCC, Holifield had a limited time to object or respond to XRI's proposal.

On November 30, 2020, XRI sent another letter to Holifield, this time also emailing a copy. The letter stated that because Holifield did not timely object or respond to the October 16 proposal, XRI had accepted the Disputed Units in satisfaction of the XRI Note. On the same day, XRI sent a letter to Holifield removing him from the Board. Directed the letter to Holifield's home address, copied him by

20

email, and also copied Holifield's counsel. Those methods of notice were quite different than what XRI used for the Letter Proposal.

On December 15, 2020, Holifield sent a letter to XRI on behalf of Blue in which he objected to the strict foreclosure. The letter directed XRI to send any further communications to Holifield's home address.

In a letter dated December 18, 2020 sent via email, XRI's counsel maintained that the strict foreclosure was effective. In that letter, counsel argued that XRI had proceeded properly by sending its proposal to Holifield because the Blue Transfer was invalid. That was the first time that XRI definitively took the position that the Blue Transfer was void, as opposed to merely suggesting the possibility. According to XRI, the strict foreclosure resulted in XRI owning the Disputed Units, the elimination of Holifield's Class B membership interest, and the zeroing out of Holifield's capital account, which had a positive balance of $20 million.

## K. Litigation Ensues.

On June 18, 2021, Assurance filed a lawsuit in Texas state court (the "Texas Action").[16] Assurance claimed that it had standing as a creditor of Blue to challenge the strict foreclosure because the Disputed Units were an asset of Blue, Assurance's debtor. Assurance alleged that XRI carried out an invalid foreclosure in order to hinder, delay, and defraud Holifield's other creditors. Assurance sought a declaratory

---

[16] *Assurance Mezzanine Fund III, L.P. v. XRI Invest. Hldgs. LLC*, No. 2021-36737 (269th Dist. Ct. Harris Cnty., Tex. June 18, 2020).

judgment that the strict foreclosure was null and void because, among other things, XRI failed to provide notice to all interested parties. Assurance also asserted claims for fraudulent transfer, unjust enrichment, and violation of the provisions in the UCC governing strict foreclosures. Assurance sought the remedies available under Section 24.008 of the Texas Uniform Fraudulent Transfer Act.

XRI responded to the Texas Action by filing this action against Holifield and Assurance. XRI sought to defeat Assurance's contention that it had proceeded incorrectly against Holifield rather than Blue by establishing that the Blue Transfer was void from the outset. With the benefit of such a declaration, XRI planned to return to the Texas Court and contend that it proceeded properly against Holifield, because Holifield had always owned the Disputed Units as a matter of law.

Assurance challenged XRI's ability to sue in this court. On October 27, 2021, XRI amended its complaint, dropped Assurance as a defendant, and added Blue.

Discovery followed. A one-day trial was held on June 15, 2022. After the conclusion of trial, XRI and Assurance settled the Texas Action.

## L. The *Post-Trial Opinion*

After post-trial briefing and argument, the court issued the *Post-Trial Opinion*. Based on the findings of fact that are now law of the case, the court held that the Blue Transfer violated the No Transfer Provision because Holifield received consideration in the transaction. The parties also disputed whether the Blue Transfer violated other requirements for a valid transfer, but the *Post-Trial Opinion* did not reach those

22

issues. One failure to comply with the No Transfer Provision was sufficient to establish breach, so the court did not address any others.

XRI also argued that the Blue Transfer violated the No Encumbrance Provision. The court did not reach that issue either. Because XRI had proven a violation of the No Transfer Provision, addressing whether Holifield also breached the No Encumbrance Provision would not have added anything to the analysis.

Holifield asserted that the equitable defense of acquiescence barred XRI's claims of breach. The court found that Holifield proved all of the elements of that defense.

The court then turned to two legal arguments against acquiescence that XRI advanced. First, XRI argued that when a plaintiff presents a court of equity with a legal claim, the court cannot consider equitable defenses (the "Legal Claim Argument"). A smattering of Court of Chancery decisions had endorsed the Legal Claim Argument to varying degrees, so the *Post-Trial Opinion* addressed the issue at great length. The resulting analysis demonstrated that there was no general rule for all equitable defenses. Instead, "[t]he distinctions among equitable defenses stem from the history of the law-equity divide and the success of some equitable defenses in crossing the barrier between those regimes."[17] The court therefore embarked on a "whirlwind historical tour"[18] to determine whether Holifield could raise the specific

---

[17] *Post-Trial Op.*, 283 A.3d at 630.

[18] *Id.*; *see id.* at 630–41.

23

defense of acquiescence. Based on that historical review, the court held that "[i]n the case of acquiescence, the defense is available, and Holifield properly raised it in this action.[19]

Because XRI's first argument failed, the court turned to the second. Here, XRI contended that under the Delaware Supreme Court's decision in *CompoSecure II*,[20] the Blue Transfer was incurably void (the "*CompoSecure* Argument"). Equitable defenses cannot validate a void act, so if the Blue Transfer really was incurably void, then acquiescence could not apply.

The court considered the *CompoSecure* Argument. Finding *CompoSecure II* controlling, the court held that Holifield could not rely on acquiescence.

That outcome meant that parties could contract for incurable voidness and thereby prevent a court of equity from relying on equitable defenses to achieve an equitable result. The *Post-Trial Opinion* stated that "[o]n the facts of the case, that is an inequitable result, and such an outcome is disquieting to a court of equity."[21] Continuing, the court explained that "[t]he longstanding role of equity is to ameliorate the occasionally harsh results that a generally sound rule of law can generate[,]" but that under *CompoSecure II*, "equity cannot serve that purpose if

---

[19] *Id.* at 641.

[20] *CompoSecure, L.L.C. v. CardUX, LLC (CompoSecure II)*, 206 A.3d 807 (Del. 2018).

[21] *Post-Trial Op.*, 283 A.3d at 592.

parties have chosen to use the word 'void' to describe the consequence of contractual noncompliance. That approach effectively gives private parties the ability to contract out of equity."[22]

What the trial court regarded as "inequitable" and "disquieting" was its inability to apply the equitable defense of acquiescence. The court was not suggesting that only XRI's conduct was "inequitable" and "disquieting" or that Holifield's conduct was exemplary. To the contrary, the *Post-Trial Opinion* found that Holifield told XRI that he was transferring the Disputed Units for estate planning purposes at a time when he had not engaged in any estate planning and did not subsequently do so.[23] The *Post-Trial Opinion* also recounted how Holifield and his attorney did not send all of the Blue Transfer documents to XRI at the time of the transaction, although they made no effort to hide the existence of the Assurance Loan.[24] Ultimately, the *Post-Trial Opinion* found that Holifield had breached the No Transfer Provision.[25]

There was thus no dispute under the *Post-Trial Opinion* that Holifield acted badly and was not blameless. But what the trial judge thought should be dispositive in a court of equity was XRI's deep involvement in structuring the Blue Transfer (through Gabriel, its CEO), followed by XRI's decision not to challenge the Blue

---

[22] *Id.*

[23] *Id.* at 600.

[24] *Id.* at 625.

[25] *Id.* at 614.

Transfer, made after seeing all of the documents and concluding that Holifield had breached the No Transfer Provision. By definition, a defense of acquiescence contemplates some prior act that a party could otherwise challenge, such as a breach of contract. There is no need to apply a defense of acquiescence if the counterparty's conduct was faultless.

Because *CompoSecure II* barred the court from applying the defense of acquiescence, the trial court ruled for XRI.

## M. The Rule 54(b) Order

Believing that the court had addressed all of the issues that the parties had presented in a meaningful way, the court instructed the parties either to submit an agreed-upon form of final order or, if there were issues that still needed to be addressed, to submit a joint letter that identified the issues and proposed a procedure for resolving them.

The parties did neither. They instead submitted a stipulation and proposed order that would have certified the court's post-trial ruling as a *partial* final judgment under Rule 54(b). The proposed order identified the following list of issues that the parties wanted the court to resolve following the appeal:

> 5. The Court has not addressed whether Holifield's breach of Section 8.01(a) of the Company Agreement was willful or grossly negligent and therefore constituted "Disabling Conduct" as defined in the Company Agreement. This issue is expressly preserved pending the outcome of any appeal.
>
> 6. The Court has not addressed the damages (if any) flowing from Holifield's breach of Section 8.01(a) of the Company Agreement. This issue is expressly preserved pending the outcome of any appeal.

26

7. The Court did not resolve Count II of the Complaint, which asserted that Holifield breached the encumbrance prohibition in Section 8.01(a) of the Company Agreement. That claim is expressly preserved pending the outcome of any appeal.

8. The Court did not resolve Counts III and V of the Complaint, which were pled as alternative counts in the event the Court found that the GH Blue Transfer was valid. These Counts and defenses thereto are expressly preserved pending the outcome of any appeal.[26]

That list sought to preserve every issue that either side might have wanted to litigate, regardless of whether the court viewed the issues as waived and the case as resolved.

Because "Delaware trial courts have inherent power to control their dockets,"[27] including determining how a case should proceed for the "orderly adjudication of claims,"[28] the trial court rejected the parties' proposed order.

- The trial court viewed XRI as having waived the Disabling Conduct issue identified in paragraph 5. In its opening post-trial brief, XRI devoted only one, ten-line paragraph to the concept of "Disabling Conduct." Dkt. 136 at 60. The sum total of XRI's analysis consisted of one sentence: "Given the multiple breaches discussed above, together with the record of concealment, XRI is entitled to a determination that Holifield acted willfully or with gross negligence." *Id.* The trial court did not believe that that level of briefing was sufficient to preserve and require a decision on the Disabling Conduct issue.

- The trial court viewed XRI's as having waived its claim for damages in paragraph 6. No one had asked the court to bifurcate the proceeding into a liability phase and a damages phase, and the court had not contemplated a second trial. In its opening post-trial brief, the word "damages" appeared only five times. Dkt. 136 at 1, 3, 6, 60. Each reference was conclusory, stating only that the trial court should award damages to XRI.

---

[26] Dkt. 142.

[27] *Solow v. Aspect Res., LLC*, 46 A.3d 1074, 1075 (Del. 2012).

[28] *Unbound P'rs Ltd. P'ship v. Invoy Hldgs. Inc.*, 251 A.3d 1016, 1030 (Del. Super. 2021) (cleaned up).

27

- The trial court saw no need for a Rule 54(b) order to preserve the claim for breach of the No Encumbrance Provision identified in paragraph 7. The *Post-Trial Opinion* explained why it had not been necessary to address that potential breach. If the trial court entered a final judgment, and if the Delaware Supreme Court reversed the claim for breach of the No Transfer Decision, then it would be incumbent on the trial court to address then the No Encumbrance Provision. There was no need to preserve that issue in a Rule 54(b) order such that the court would have to address it regardless of the outcome on appeal.

- The trial court saw no need for a Rule 54(b) order to preserve XRI's other claims in Counts III and V or Holifield's defenses, as discussed in paragraph 8. As with the claim for breach of the No Encumbrance Provision, those were alternative claims. If the court entered a final judgment—as opposed to a partial final judgment—and if the Delaware Supreme Court reversed the finding that Holifield breached the No Transfer Provision, then those claims would become pertinent on remand. There was no need to preserve those issues in a Rule 54(b) order such that the court would have to address it regardless of the outcome on appeal.

The trial court therefore entered a final judgment, as opposed to a partial final judgment, that briefly addressed why the court had not adopted the parties' form of order.

## N.    The Supreme Court Opinion

Holifield noticed an appeal, and XRI noticed a cross-appeal. Holifield did not appeal the trial court's finding that he had breached the No Transfer Provision, so that issue was not presented to the Delaware Supreme Court. Holifield only argued on appeal that he should have been able to invoke the defense of acquiescence. By the

same token, XRI did not appeal the trial court's rejection of the Legal Claim Argument.[29] XRI only advanced the *CompoSecure* Argument.

The bulk of the *Supreme Court Opinion* addressed the *CompoSecure* Argument. The justices rejected the *Post-Trial Opinion*'s suggestion regarding a different approach and reaffirmed the doctrine of incurable contractual voidness—at least for purposes of LLC agreements. Having reached this conclusion the Delaware Supreme Court affirmed the trial court's holding that acquiescence could not validate the Blue Transfer and that the Blue Transfer was void.[30]

The *Supreme Court Opinion* also addressed XRI's cross-appeal, reversing the trial court's refusal to enter the agreed-upon Rule 54(b) order. Having stipulated to that order, Holifield was not well positioned to defend the trial court's ruling, and

---

[29] Because the *CompoSecure* Argument was the only defense at issue on appeal, aspects of the *Post-Trial Opinion* lacked context when presented to the high court. That led the justices to conclude that the court's historical analysis of the division between law and equity and its implications for affirmative defenses was dicta. At the outset of their opinion, the justices stated: "[T]he Court of Chancery, in dicta in its 154-page opinion, detailing the division between law and equity from the time of medieval England, concluded that this Court should reconsider its ruling in *CompoSecure II* which allows parties to an LLC agreement to contract for incurable voidness." *Supreme Ct. Op.*, 304 A.3d at 900–01. The *Post-Trial Opinion*'s historical discussion about the division between law and equity, however, did not address the *CompoSecure* Argument. It addressed the Legal Claim Argument. For that issue, the discussion was not dicta because it was necessary to distinguish prior Court of Chancery cases, illustrate how equity and law treated different affirmative defenses, and resolve the Legal Claim Argument.

[30] *Id.* at 940.

29

Holifield's counsel did not mention it at oral argument. XRI's application was effectively unopposed.

The Delaware Supreme Court determined that XRI had not waived any of its arguments. The Delaware Supreme Court held that because the court had awarded declaratory relief to XRI finding that the Blue Transfer was void, that reasoning "applies equally to an award of damages."[31] The justices instructed the trial court on remand to "consider the amount of damages to which XRI is entitled."[32]

The Delaware Supreme Court also concluded that XRI had not waived its claim for recoupment, despite the minimal discussion that XRI had provided on this issue. The justices instructed this court on remand to consider the recoupment issue as well.[33]

At the end of its opinion, the Delaware Supreme Court asked a series of rhetorical questions about the factual record:

> [A]lthough the Court of Chancery found the result in favor of XRI to be "disquieting," from our standpoint, the facts as found reflect conduct on both sides of the "v" that is disquieting. For example, if Holifield truly believed that his Assurance Loan structure was completely on "his side of the ledger," and if it were so clear to him that the No Encumbrance Provision could not be extended to the types of rights that a general creditor would have without breaching the No Encumbrance Provision, why would he go to such lengths to withhold the details of the loan? And

---

[31] *Supr. Ct. Op.*, 304 A.3d at 937.

[32] *Id.* at 938.

[33] *Id.*

30

why would he represent that the transfer was for estate planning purposes when that was not the case?

It could be that Holifield simply did not wish to bother the Morgan Stanley XRI representatives with the matter, as the Vice Chancellor found. Or it could be that after receiving Morgan Stanley's clear message following their rejection of his second-position pledge idea, Holifield feared that the Assurance Loan was actually too close to the middle "of the ledger," or would invite "trouble with Morgan Stanley" by encroaching on XRI's "side of the ledger." The litigation and settlement with Assurance in Texas suggests that the arrangement actually did present a close question, as the Vice Chancellor recognized. Gabriel may have figured it all out, as the Vice Chancellor concluded, but it also appears that Gabriel was trying to secure from Holifield restoration of his equity interest in Entia (which Gabriel had transferred to Holifield for one dollar in April 2018).

Further, it is unclear to us how XRI actually benefitted from this transfer, given its perfected security interest in the Disputed Units and the resulting Texas Litigation. And as for its delay after receiving the documents in April 2019, it seems reasonable that, having reserved its rights, XRI would not take action until after Holifield defaulted in 2020. The bottom line is that based on the record as we view it, the questionable conduct is not tilting so heavily in either side's favor, and we are not convinced that the result in XRI's favor is "disquieting" and "inequitable."[34]

The *Supreme Court Opinion* stressed that the justices were not reversing any of the trial court's factual findings, which were not challenged on appeal.[35] But it seems evident from the detailed attention that the justices gave to those questions that they had concerns about the factual findings in the *Post-Trial Opinion.* The justices' thoughtful questions deserve equally thoughtful responses. This decision attempts to provide them.

---

[34] *Supr. Ct. Op.*, 304 A.3d at 938–39 (footnotes omitted).

[35] *Id.* at 939.

The first sentence of the Delaware Supreme Court's observation indicates that the *Post-Trial Opinion* failed to clearly explain what the trial court found to be "disquieting" and "inequitable." As discussed previously, it was the operation of incurable contractual voidness that the trial court found "disquieting" and "inequitable." That is, when referring to the outcome as "an inequitable result" that was "disquieting to a court of equity," the *Post-Trial Opinion* was not weighing the parties' relative culpability or denying that there was disquieting conduct "on both sides of the 'v.'"[36] Nor was the *Post-Trial Opinion* asserting that "the questionable conduct" had "tilt[ed] so heavily in either side's favor." To say it outright, the *Post-Trial Opinion* did not view the "the result in XRI's favor [as] 'disquieting' and 'inequitable'" because XRI acted culpably and Holifield did not.[37] Instead, the *Post-Trial Opinion* was describing a doctrinal outcome in which a court of equity could not address equitable defenses.

Focusing on Holifield's claim about estate planning, the justices asked "why would he represent that the transfer was for estate planning purposes when that was not the case?"[38] That was indeed a misrepresentation. Nothing in the *Post-Trial Opinion* attempted to justify that misrepresentation. To the contrary, the *Post-Trial Opinion* rejected Holifield's testimony that the Blue Transfer was actually for estate

---

[36] *Supr. Ct. Op.,* 304 A.3d at 938–39.

[37] *Id.* at 939.

[38] *Id.*

planning, which contributed to the holding that the Blue Transfer breached the No Transfer Provision.

The justices also asked "if Holifield truly believed that his Assurance Loan structure was completely on 'his side of the ledger,' and if it were so clear to him that the No Encumbrance Provision could not be extended to the types of rights that a general creditor would have without breaching the No Encumbrance Provision, why would he go to such lengths to withhold the details of the loan?"[39] There are a number of factual assumptions packed into that question.

One is that Holifield went to "such lengths to withhold the details of the loan." That seems to imply that Holifield went great lengths. From the trial court's perspective, those lengths amounted to (i) not broadcasting the entire structure to Morgan Stanley before pursuing it, (ii) leaving out any reference to Entia's right to proceeds from the LLC Agreement for Blue, and (iii) not sharing all of the loan documents with XRI when he first sent them over on May 30, 2018, while at the same time not hiding Assurance's existence.

Reasonable minds can differ about how far those lengths went relative to other things that Holifield might have done. What the *Post-Trial Opinion* regarded as significant was that Holifield pursued a transaction structure that Gabriel, XRI's CEO, came up with and which seemed like it would mesh with Morgan Stanley's comment about keeping any financing on Holifield's side of the ledger. When taking

---

[39] *Id.*

these actions, Holifield also benefited from advice from counsel. The *Post-Trial Opinion* did not hold that those actions were proper, only that Holifield took steps that he and counsel believed—reasonably and in good faith—would be acceptable to XRI and Morgan Stanley. The *Post-Trial Opinion* also considered the fact that when XRI specifically asked for all of the documents, Holifield and his counsel handed them over. The *Post-Trial Opinion* therefore concluded that Holifield relied—reasonably and in good faith—on input from Gabriel and his lawyers about what XRI and Morgan Stanley wanted to know when limiting the information that went to XRI,

For Holifield, not sending all of the documents and not describing the full transaction to Morgan Stanley meant that he took a risk that Morgan Stanley would object later. When weighed against a desire not to trigger an extended debate with Morgan Stanley, the risk did not seem unreasonable.[40]

Another implicit factual assumption questions how Holifield could have "believed that his Assurance Loan structure was completely on 'his side of the ledger'" and why it could have been "so clear to him that the No Encumbrance Provision could not be extended to the types of rights that a general creditor would have."[41] The trial

---

[40] The *Post-Trial Opinion* tried to explain this by describing Holifield's counsel's fear that if they provided more information to Morgan Stanley, "then Morgan Stanley or XRI might slow down the process with questions on issues that ultimately did not concern them." *Post-Trial Op.,* 283 A.3d at 601. The *Post-Trial Opinion* also noted that in recommending against initially providing the documents, "Holifield's counsel reasoned that because the arrangement did not affect XRI's side of the ledger, there was no need for disclosure." *Id.*

[41] *Supr. Ct. Op.,* 304 A.3d at 939.

court thought it was clear that the No Encumbrance Provision could not be violated if the counterparty only received the rights of a general creditor because, by definition, a general creditor does not possess any liens or priorities that could qualify as encumbrances. The court also thought that Morgan Stanley had to believe that some kind of financing structure would be permissible, otherwise it would have made no sense for Burt to say that Morgan Stanley did not want to interfere with Holifield's efforts to raise financing and would not object as long as Holifield kept the financing on "his side of the ledger." For Burt's statement not to be a misrepresentation, there had to be some path for Holifield to navigate.

> In the second paragraph of their observations, the justices stated:

> It could be that Holifield simply did not wish to bother the Morgan Stanley XRI representatives with the matter, as the Vice Chancellor found. Or it could be that after receiving Morgan Stanley's clear message following their rejection of his second-position pledge idea, Holifield feared that the Assurance Loan was actually too close to the middle "of the ledger," or would invite "trouble with Morgan Stanley" by encroaching on XRI's "side of the ledger." The litigation and settlement with Assurance in Texas suggests that the arrangement actually did present a close question, as the Vice Chancellor recognized. Gabriel may have figured it all out, as the Vice Chancellor concluded, but it also appears that Gabriel was trying to secure from Holifield restoration of his equity interest in Entia (which Gabriel had transferred to Holifield for one dollar in April 2018).[42]

The *Post-Trial Opinion* did not mean to suggest that the debate over providing the transaction documents to Morgan Stanley resulted from Holifield simply not wanting "to bother the Morgan Stanley XRI representatives with the matter." The question

---

[42] *Id.* at 939.

Holifield and his counsel faced was whether to provide information to Morgan Stanley that Holifield and his counsel believed would cause Morgan Stanley to ask a series of questions about issues that did not affect Morgan Stanley's rights. Answering those questions would slow down the closing of the deal. Holifield and his counsel believed that Morgan Stanley ultimately would be comfortable with what they were doing, but they did not want to have to go through the rigamarole of explaining that, particularly when Gabriel, XRI's CEO, had come up with the idea for the structure and had discussed it with Holifield. Whether to ask permission or seek forgiveness is often a debatable call, as it was here.

The Post-Trial Opinion found that Holifield and his counsel made a reasonable judgment in good faith. The Post-Trial Opinion did not find that Holifield and his counsel believed there was no risk. Nor did the Post-Trial Opinion find that Holifield and his counsel made the right decision. In fact, they didn't, because this court found that the Blue Transfer violated the No Transfer Provision. The Post-Trial Opinion merely found that Holifield and his counsel could believe reasonably and in good faith that they were providing the information that Morgan Stanley needed and wanted— and only that information.

In its penultimate observation, the justices noted that "it is unclear to us how XRI actually benefitted from this transfer, given its perfected security interest in the Disputed Units and the resulting Texas Litigation."[43] At least from the standpoint of

---

[43] *Id.*

the trial judge, this was a simple example of backup protection. The structural subordination added a belt to the suspenders of XRI's security interest.

For the holder of a security interest, backup protection is meaningful. Parties frequently litigate the validity of security interests, and there are many pitfalls that can result in the lender holding a security interest that was not properly perfected.[44] The structural subordination of Blue's other creditors meant that if there was a problem with XRI's security interest, XRI's claim would have senior status.

In its final observation, the justices commented that "it seem[ed] reasonable that, having reserved its rights, XRI would not take action until after Holifield defaulted in 2020."[45] If that fact stood alone, then the trial court would have reached the same conclusion. What the *Post-Trial Opinion* found significant was that Morgan Stanley made a business decision not to pursue litigation against Holifield, then seemingly only changed its mind after developing the strict-foreclosure strategy a board meeting that Holifield was not invited to attend. The trial court regarded the

---

[44]*See, e.g., Off. Comm. of Unsec. Creds. of Motors Liquid. Co. v. JPMorgan Chase Bank, N.A.*, 103 A.3d 1010 (Del. 2014); *Matter of Liquid. of Indem. Ins. Corp., RRG*, 2019 WL 2152844, at \*5 (Del. Ch. May 15, 2019); *Pan Ocean Navigation, Inc. v. Rainbow Navigation, Inc.*, 1987 WL 13519 (Del. Ch. July 8, 1987), *aff'd*, 535 A.2d 1357 (Del. 1987). Litigation over security interests is so frequent that Westlaw lists over one-hundred ALR compilations collecting on that issue. *See, e.g., Construction and Effect of UCC art. 9 dealing with secured transactions, sales of account, contract rights, and chattel paper*, 30 A.L.R.3d 9 (1970 & Supp.); Gary D. Spivey, *Definition and Treatment of "General Intangibles" Under Revised Article 9 of Uniform Commercial Code*, 33 A.L.R.7th Art. 4 (2017).

[45] *Supr. Ct. Op.*, 304 A.3d at 939.

decision to sue as part and parcel of XRI's effort to complete a strict foreclosure and gain the benefit of any incremental value that the Disputed Units possessed, rather than having to pay over to Holifield the amount by which the value of the Disputed Units exceeded the amount due on the XRI Loan.

## O.    The Remand

After the Delaware Supreme Court remanded the case, the parties reached agreement on how to proceed. They submitted a stipulation that provided for a briefing sequence.

XRI supplemented the record with evidence to support the amounts incurred litigating and settling the Texas Action. XRI settled the Texas Action shortly after the trial and before the first round of post-trial briefing. XRI thus could have introduced a figure for its damages claim then, but did not.

The court held oral argument on July 11, 2024.

## II.    LEGAL ANALYSIS

The Delaware Supreme Court remanded this case for the trial court to determine the amount of XRI's damages for breach of the LLC Agreement, address whether XRI could recoup the expenses advanced to Holifield, and determine the amount if recoupment was available. The justices also invited the trial court to analyze whether Holifield breached the No Encumbrance Provision to the extent necessary to determine whether XRI could recoup the expenses it advanced. On remand, Holifield conceded that he breached the No Encumbrance Provision. To

38

address these issues, the trial court applies the principles of contract interpretation described in the *Post-Trial Opinion*.

## A.    The Claim For Damages For Breach Of The LLC Agreement

The first issue is the extent of XRI's damages for Holifield's breach of the LLC Agreement. The *Post-Trial Opinion* found that Holifield breached the No Transfer Provision. The Delaware Supreme Court affirmed that ruling. The Delaware Supreme Court also raised the potential need for the trial court to determine whether Holifield also breached the No Encumbrance Provision. On remand, Holifield conceded that he breached that provision.

As damages, XRI seeks the amounts it incurred to litigate and settle the Texas Action. A non-breaching party can recovery expectation damages measured by "the loss in the value . . . of the other party's performance caused by its failure or deficiency" plus "any other loss, including incidental or consequential loss, caused by the breach," minus "any cost or other loss" that the non-breaching party "avoided by not having to perform."[46]

"Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made."[47] A loss may be foreseeable as a probable result of breach if the loss would follow from

---

[46] Restatement (Second) of Contracts § 347 (Am. L. Inst. 1981), Westlaw (database updated June 2024).

[47] *Id.* § 351.

breach either (1) in the ordinary course of events or (2) as a result of special circumstances that the breaching party had reason to know.[48]

> A contracting party is generally expected to take account of those risks that are foreseeable at the time he makes the contract. He is not, however, liable in the event of breach for loss that he did not at the time of contracting have reason to foresee as a probable result of such a breach. The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable. It is enough, however, that the loss was foreseeable as a probable, as distinguished from a necessary, result of his breach. . . . [T]he test is an objective one based on what he had reason to foresee.[49]

"The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable."[50]

A party can recover breach-of-contract damages for amounts spent to address litigation resulting from the counterparty's breach:

> <u>Litigation or settlement caused by breach.</u> Sometimes a breach of contract results in claims by third persons against the injured party. The party in breach is liable for the amount of any judgment against the injured party together with his reasonable expenditures in the litigation, if the party in breach had reason to foresee such expenditures as the probable result of his breach at the time he made the contract. . . . In furtherance of the policy favoring private settlement of disputes, the injured party is also allowed to recover the reasonable amount of any

---

[48] *Id.* § 351(2).

[49] *Id.* § 351 cmt. A.

[50] *Id.*

settlement made to avoid litigation, together with the costs of settlement.[51]

Once again, the loss must be foreseeable.

The Texas Action was a foreseeable result of the Blue Transfer and the Assurance Loan. Under the terms of the Assurance Loan, Assurance expected to receive a portion of the net proceeds from any sale of the Disputed Units that remained after the satisfaction of the XRI Note was paid. It was foreseeable that Assurance would sue to preserve its right to the net proceeds if that right was jeopardized.

The actual claim that Assurance asserted complicates matters somewhat. When Assurance sued in Texas, Assurance asserted that it had a right to the Disputed Units themselves, not just a claim on the net proceeds from any sale of the Disputed Units that remained after the satisfaction of the XRI Note. That claim ran contrary to the structure of the Assurance Loan, the plain language of the Assurance Loan documents, and the whole concept of the transaction. It also ran contrary to the position Assurance took in this court, where Assurance and Holifield maintained that Assurance only had a right to net proceeds.

Because Assurance in fact only had a right to net proceeds, one could debate whether Holifield could foresee that Assurance would assert rights in the Texas Action that it plainly did not have. But when Holifield intervened in the Texas Action,

---

[51] Restatement (Second) of Contracts § 351 cmt. c (Am. L. Inst. 1981), Westlaw (database updated June 2024).

he joined in the arguments that Assurance was making. Despite the fact that he would later argue something different to this court, Holifield endorsed Assurance's positions. By doing so, he maintained that at least for purpose of the Texas Action, he thought he had granted Assurance rights to the Disputed Units themselves. Litigation over the Disputed Units themselves was foreseeable to the extent Holifield granted Assurance those rights.

XRI spent a year litigating the Texas Action. When discussing the ability to cover litigation expenses as damages, the *Restatement* only contemplates the recovery of "reasonable expenditures in the litigation, if the party in breach had reason to foresee such expenditures as the probable result of his breach at the time he made the contract."[52] XRI asserts that it accrued $1.6 million in legal fees and costs litigating the Texas Action. Holifield does not dispute the reasonableness of that amount.

XRI also paid $2.5 million to settle the Texas Action. XRI is entitled to recover both those amounts as damages for breach of the LLC Agreement, for an aggregate award of $4.1 million.

## B. The Claim For Recoupment

XRI also seeks to recoup the amounts advanced to Holifield in connection with this proceeding. This decision finds that XRI is entitled to recoup the amounts

---

[52] Restatement (Second) of Contracts § 351 cmt. c (Am. L. Inst. 1981), Westlaw (database updated June 2024).

advanced to Holifield because Holifield engaged in Disabling Conduct when he willfully breached the No Transfer Provision.

The LLC Agreement establishes a general right of indemnification that is subject to a proviso foreclosing indemnification to any otherwise indemnified party who engaged in "Disabling Conduct." The provision states:

> The Company hereby agrees to indemnify and hold harmless any Person (each, an "**Indemnified Person"**) to the fullest extent permitted under the Delaware Act . . . against all expenses, liabilities and losses (including reasonable attorney costs, fees and expenses . . .) ("**Indemnifiable Losses**") reasonably incurred or suffered by such Person . . . by reason of the fact that such Person is or was a Member . . . *provided, however*, that (unless the Board otherwise consents) no Indemnified Person shall be indemnified for any Indemnifiable Losses suffered that are attributable to such Indemnified Person's or its Affiliates' Disabling Conduct. . . . Expenses, including reasonable attorney costs, fees and expenses, incurred by any such Indemnified Person in defending a proceeding shall be paid by the Company in advance of the final disposition of such proceeding, including any appeal therefrom, upon receipt of an undertaking by or on behalf of such Indemnified Person . . . .[53]

Under this provision, XRI has been advancing Holifield's expenses for this action.

The LLC Agreement defines Disabling Conduct as "gross negligence or willful breach of this Agreement."[54] The LLC Agreement does not define "gross negligence" or "willful breach," but those terms have a settled meaning under Delaware law. "[W]here a word has attained the status of a term of art and is used in a technical

---

[53] LLCA § 5.04(a).

[54] *Id.* § 4.07(a).

context, the technical meaning is preferred over the common or ordinary meaning."[55] "When established legal terminology is used in a legal instrument, a court will presume that the parties intended to use the established legal meaning of the terms."[56]

In civil cases not involving business entities, the Delaware Supreme Court has defined gross negligence as "a higher level of negligence representing 'an extreme departure from the ordinary standard of care.'"[57] This test "is the functional equivalent" of the test for "[c]riminal negligence."[58] By statute, Delaware law defines "criminal negligence" as follows:

> A person acts with criminal negligence with respect to an element of an offense when the person fails to perceive a risk that the element exists or will result from the conduct. The risk must be of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.[59]

---

[55] *Penton Bus. Media Hldgs., LLC v. Informa PLC*, 252 A.3d 445, 461 (Del. Ch. 2018) (quoting *Viking Pump, Inc. v. Liberty Mut. Ins. Co.*, 2007 WL 1207107, at *13 (Del. Ch. Apr. 2, 2007)).

[56] *Penton*, 252 A.3d at 461.

[57] *See, e.g.*, *Browne v. Robb*, 583 A.2d 949, 953 (Del. 1990) (quoting W. Prosser, *Handbook of the Law of Torts* 150 (2d ed. 1955)).

[58] *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 530 (Del. 1987).

[59] 11 *Del. C.* § 231(a).

Under this framework, gross negligence "signifies more than ordinary inadvertence or inattention," but it remains "a degree of negligence, while recklessness connotes a different type of conduct akin to the intentional infliction of harm."[60]

In cases involving business entities, however, gross negligence has acquired its own, special meaning and requires conduct akin to recklessness.[61] By statute, Delaware has defined recklessness as a situation where "the person is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from the conduct."[62] The risk "must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."[63] For purposes of its entity law,

---

[60] *Jardel*, 523 A.2d at 530.

[61] *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 n.45 (Del. Ch. 2008) ("[T]he definition [of gross negligence in corporate law] is so strict that it imports the concept of recklessness into the gross negligence standard . . . ."); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005) ("Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one which involves a devil-may-care attitude or indifference to duty amounting to recklessness." (cleaned up)); *Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990) ("In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." (cleaned up)); *Solash v. Telex Corp.*, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988) (Allen, C.) (explaining that to be grossly negligent, a decision "has to be so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion." (cleaned up)).

[62] 11 *Del. C.* § 231(e).

[63] *Id.*; *see id.* § 231(a).

45

therefore, Delaware law requires conduct more serious than what would be necessary to secure a conviction for criminal negligence; it requires recklessness.[64]

Surprisingly, no Delaware court has addressed what constitutes a "willful breach" in a scenario where the parties have not defined that term. Debate exists over what has to be willful. Under one view, the breaching party need only have taken action knowingly and intentionally, without having to know that that the conduct would cause a breach. Under a stricter view, the breaching party must have known that the conduct would constitute a breach and have acted purposefully to breach the contract. Under an even stricter view, the breaching party must have specifically intended to harm the counterparty such that the breach constitutes an intentional tort.[65]

This court has addressed the concept of a knowing and intentional breach. In *Hexion*, this court held that a party commits a knowing and intentional breach when the party knowingly and intentionally acts, regardless of whether the party knows that action will constitute a breach.[66] The *Hexion* decision rejected the argument that

---

[64] *In re McDonald's Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 689 (Del. Ch. 2023).

[65] *See generally* Michael B. de Leeuw & Brian J. Howard, *What Is a Willful Breach of Contract?*, N.Y. L. J. (Apr. 3, 2006).

[66] *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 746 (Del. Ch. 2008).

the breaching party must know its conduct constitutes a breach as "simply wrong."[67]

For support, the court looked to criminal law:

> Momentarily drawing the analogy to criminal law . . . makes this immediately clear: it is the rare crime indeed in which knowledge of the criminality of the act is itself an element of the crime. If one man intentionally kills another, it is no defense to a charge of murder to claim that the killer was unaware that killing is unlawful. Similarly, if a man takes another's umbrella from the coat check room, it may be a defense to say he mistakenly believed the umbrella to be his own (a mistake of fact). It is no defense to say he had not realized that stealing was illegal, nor is it a defense that it was not his "purpose" to break the law, but simply to avoid getting wet. . . . [A] mistake of law virtually never excuses a violation of law.[68]

Since *Hexion*, parties have been able to contract around that interpretation by defining a term like willful breach to require that the breaching party know its intentional conduct constitutes a breach.[69]

---

[67] *Id.*

[68] *Id.* at 746–47.

[69] *See, e.g.*, *In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *5 (Del. Ch. Aug. 31, 2020) (noting that "[t]he Merger Agreement defined that term as conduct that both constituted a material breach and which the breaching party subjectively knew would constitute a material breach"), *aff'd* 251 A.3d 1015 (Del. 2021); *Genuine Parts Co. v. Essendant Inc.*, 2019 WL 4257160, at *3 n.17 (Del. Ch. Sept. 9, 2019) ("The Agreement defines 'Willful Breach' as 'a breach of, or failure to perform any of the covenants or other agreements contained in this Agreement, that is a consequence of an act or failure to act by the breaching party . . . with actual knowledge that such Person's act or failure to act would, or would reasonably be expected to, result in or constitute a breach of or failure of performance under the Agreement.'"). That does not mean they always do. A study of 1,000 merger and acquisition agreements finds that although the vast majority tie damages to a concept of willful breach, less than one third of public deals and under one tenth of private deals define the term. *See generally* Theresa Arnold, Amanda Dixon, Madison Whalen Sherrill, Hadar Tanne & Mitu Gulati, *The Cost of Guilty Breach: Willful Breach in M&A Contracts*, 62 Bos.

Scholars have also weighed in. Professor Richard Craswell argues that a willful breach cannot be defined simply in terms of a mental state and is rather a legal conclusion applied to a breach that is sufficiently serious that a court must increase the damages amount to deter similar conduct.[70] Professors Oren Bar-Gill and Omri Ben Shahar argue that willful breaches are those that reveal the counterparty as "the type of transactor who readily chisels and acts in a dishonest way, and has likely exercised bad faith in other situations without being sanctioned," such that an additional remedy is warranted.[71] Professors Steve Thel and Peter Siegelman argue that a willful breach is one that harms the non-breaching party more than its benefits the breaching party, thus creating a net negative outcome and a deadweight loss. Under this view, a court treats a willful breach as one that cannot be justified under the doctrine of efficient breach.[72]

In the LLC Agreement, the juxtaposition of "willful breach" with a breach that resulted from "gross negligence" calls for a different interpretation than in *Hexion.*

---

Coll. L. Rev. 32, 34, 45 (2021) (reviewing 1,000 M&A agreements and finding that over sixty percent tie damages to whether the breach was willful, whereas less than half of public and private deals define "willful" or "willful breach").

[70] *See* Richard Craswell, *When is a Willful Breach "Willful"? The Link Between Definitions and Damages*, 107 Mich. L. Rev. 1501, 1502–07 (2009).

[71] Oren Bar-Gill and Omri Ben-Shahar, *An Information Theory of Willful Breach*, 107 Mich. L. Rev. 1479, 1483 (2009).

[72] *See* Steve Thel & Peter Siegelman, *Willfulness Versus Expectation: A Promisor-Based Defense of Willful Breach Doctrine*, 107 Mich L. Rev. 1517, 1519–20, 1531 (2009).

Both terms are relational: Conduct is grossly negligent (reckless) relative to some standard. The LLC Agreement does not seem to be targeting grossly negligent conduct generally, but rather a scenario in which the counterparty should have known that its conduct would constitute a breach and yet went forward anyway.

From that baseline, willful breach for purposes of the LLC Agreement requires that a party intentionally act while knowing that the conduct would constitute a breach. The LLC Agreement does not seem to be targeting willful conduct in the sense of voluntary action. It seems to be ratcheting the required mental state up one level by requiring that the counterparty both have acted intentionally and known that its action would cause a breach.

Interpreting a willful breach as involving a breach that a party committed knowing it was a breach comports with a line of Delaware Superior Court authority that authorizes an award of punitive damages for "wilful [sic] or malicious breaches of contract."[73] The rationale for awarding punitive damages in that setting is tort-based and requires that a court examine the breaching party's conduct closely to determine whether it was "outrageous," resulted from an "evil motive," or reflected

---

[73] *Jardel*, 523 A.2d at 529; *accord Callahan v. iLight Techs., LLC,* 2022 WL 2902810, at *5 (Del. Super. Ct. July 21, 2022); *Ripsom v. Beaver Blacktop, Inc.*, 1988 WL 32071, at *16 (Del. Super. Apr. 6, 1988); *Cloroben Chem. Corp. v. Comegys*, 464 A.2d 887 (Del. 1983). The Court of Chancery, of course, lacks jurisdiction to award punitive damages, although it can award exemplary damages when specifically authorized by statute. *Beals v. Wash. Int'l, Inc.*, 386 A.2d 1156, 1159 (Del. Ch. 1978).

"reckless indifference to the rights of others."[74] Those descriptions imply that the breaching party had knowledge of what the agreement required and yet transgressed those boundaries in an outrageous, knowing, or malicious way.

This decision therefore concludes that for XRI to prove a willful breach, XRI must prove that Holifield took intentional action knowing that the action would breach the LLC Agreement.

### 1. The Breach Of The No Transfer Provision

As its first basis for recoupment, XRI contends that by securing the Assurance Loan, Holifield engaged in conduct that constituted a grossly negligent or willful breach of the No Transfer Provision. XRI proved that Holifield willfully breached that provision.

The No Transfer Provision generally prohibits XRI's members from transferring their member interests, except if the transfer meets the Permitted Transferee Exception. One of the requirements for the Permitted Transferee Exception was that the transfer be made for no consideration. The *Post-Trial Opinion* found that Holifield made the Blue Transfer as part of a larger transaction in which Holifield secured the Assurance Loan. Holifield is charged with knowledge of the terms of the LLC Agreement. He had to know that Blue Transfer was critical to receiving $3.5 million from Assurance. That was a willful breach.

---

[74] *Jardel*, 523 A.2d at 529 (citing Restatement (Second) of Torts § 908, cmt. b (1979)).

To defeat this outcome, Holifield cites this court's findings at various points in the *Post-Trial Opinion* to the effect that Holifield and his counsel believed, reasonably and in good faith, that they were moving forward with a transaction that would be acceptable. The *Post-Trial Opinion* did not hold that Holifield did not breach the No Transfer Provision. It held the opposite.

When the *Post-Trial Opinion* referenced the good faith belief that Holifield and his counsel reasonable held, it was a series of interactions with representatives of XRI that would have supported a finding of acquiescence. The *Post-Trial Opinion* found that based on those interactions, Holifield and his counsel reasonably believed, in good faith, that they had crafted a structure that would not result in any objection or challenge from XRI, notwithstanding the fact that the structure might not meet the literal terms of the LLC Agreement.

Those interactions included the following:

- Burt, the point man for Morgan Stanley, represented to Holifield that XRI would not care "as long as Holifield kept any financing 'on his side of the ledger.'"[75]

---

[75] *Post-Trial Op.*, 283 A.3d at 590; *accord id.* at 597 ("Burt told Holifield that as long as he kept the arrangement 'on [his] side of the ledger,' then Morgan Stanley 'didn't care.'"); *see id.* ("Holifield reasonably understood Burt to be saying that 'effectively, as long as [Holifield] could set up a structure in which there was no direct pledge of the units themselves, and [Holifield] kept all of the risk that was associated with that on [his] side, on the Entia side, then that would be satisfactory.'"); *see also id.* at 598 ("Morgan Stanley had an interest in keeping them happy, as long as their plans did not prejudice XRI's rights in the Disputed Units.").

51

- Gabriel, the CEO of XRI, "worked with Holifield to obtain financing for Entia"[76] and, through Entia, for the other operating companies they jointly owned.[77]

- Gabriel, the CEO of XRI, "helped Holifield explore how to sue the Disputed Units to raise capital."[78]

- Gabriel, the CEO of XRI, had expertise in structuring complex transactions as "a former attorney who spent the majority of his legal career at Kirkland & Ellis," where he "practiced corporate law with an emphasis on private equity transactions."[79]

- Gabriel, the CEO of XRI, "helped Holifield develop the structure for the financing" by suggesting the idea of giving a lender a right to the net proceeds from any sale of the Disputed Units, after the XRI Note was paid off. [80]

- Gabriel, the CEO of XRI, prepared "a detailed spreadsheet" for Holifield to use in raising capital that "included a capitalization table, referenced Holifield's $20 million capital account and the XRI Loan, and modeled potential exit scenarios with the associated waterfall of proceeds at valuations ranging from $250 million to $600 million."[81]

---

[76] *Id.* at 590; *accord id.* at 595 ("Gabriel worked with Holifield to find ways to rase the capital" their jointly owned companies needed.).

[77] *Id.* at 594.

[78] *Id.* at 595; *accord id.* at 598 ("After the call with Burt, Gabriel and Holifield brainstormed structures that would keep a loan on Holifield's 'side of the ledger.'").

[79] *Id.* at 594.

[80] *Id.* at 590; *accord id.* ("Gabriel knew that Holifield was making the Blue Transfer to facilitate Entia's ability to obtain a loan."); *id.* at 598–99 ("Gabriel and Holifield did not think that Assurance would want to be on the same level as Holifield's other general creditors, so they discussed whether Holifield could agree to provide Assurance with an earmarked right to the net proceeds of any sale of the Disputed Units, but only after Holifield received them.") (emphasis omitted); *id.* ("Gabriel and Holifield concluded that the structure would work under the LLC Agreement, but Gabriel thought that no creditor would ever go for it.").

[81] *Id.* at 596.

- Gabriel, the CEO of XRI, knew that Holifield "planned to obtain additional capital from Assurance. He also . . . planned to transfer the Disputed Units to Blue."[82]

- Gabriel, the CEO of XRI "interacted with the lender who extended the financing, knew the loan was going to close contemporaneously with the Blue Transfer, [and] learned the loan had closed shortly afterward."[83]

- Gabriel, the CEO of XRI "took credit for helping Holifield obtain the loan."[84]

- Gabriel, the CEO of XRI, told Holifield that "it made sense 'to limit the documents that XRI is signing to those for which XRI's signature is strictly required'" and asked for modifications to the documents "[w]ith the goal of minimizing XRI's involvement."[85]

---

[82] *Id.* at 600.

[83] *Id.* at 590; *accord id.* at 596 (finding that Gabriel spoke with Ellis on May 8, 2018, and gave Ellis the impression that he "wanted [Ellis] to help [Holifield] and help Entia").

[84] *Id.* at 590; *accord id.* at 604–05 ("Over the following months, Gabriel emphasized his role in helping Holifield secure financing for Entia as part of his efforts to convince Holifield to restore the equity interest in Entia that Gabriel had transferred to Holifield for one dollar").

[85] *Id.* at 602; *accord id.* at 604 ("[B]ased on Burt's comment to Holifield about keeping any transaction on his side of the ledger and Gabriel's comment about XRI not wanting to sign any documents that XRI was not required to approve, they believed—reasonably and in good faith—that Morgan Stanley did not want XRI to be involved in any capital-raising efforts by Holifield, unless its approval was contractually required.").

- Holifield forward to Gabriel, the CEO of XRI, an email that referred directly to the Assurance Loan,[86] and Gabriel subsequently received an email from Ellis stating "We closed on [Holifield's] loan as you know."[87]

- Ten months after the Assurance Loan closed, after obtaining all of the documents related to the financing, and after its lawyers concluded that the Blue Transfer violated the LLC agreement, "XRI's governing board made a business decision not to pursue it."[88]

Based on those interactions, the *Post-Trial Opinion* found that Holifield and his counsel believed—reasonably and in good faith—that XRI would not object to the Blue Transfer, even though it violated provisions in the LLC Agreement. Those findings included the following:

- "Holifield demonstrated that XRI took a series of actions which caused Holifield to believe—reasonably and in good faith—that XRI did not object to the Blue Transfer, notwithstanding that it was part of a financing transaction."[89]

- "Holifield and his lawyers believed—reasonably and in good faith—that they had complied with [the] directive" to keep the financing transaction on Holifield's side of the ledger.[90]

---

[86] *Id.* at 603 ("Demonstrating that neither Holifield nor his lawyer was trying to hide the Assurance Loan, the forwarded email included the full email from Holifield's counsel, including the statement that 'there's no real uncertainty about closing Assurance.'").

[87] *Id.* at 604.

[88] *Id.* at 590; *accord id.* at 529 ("XRI's governing board made a business decision not to challenge the Blue Transfer.").

[89] *Id.* at 590.

[90] *Id.* at 590; *accord id.* at 600 ("Through [the Assurance Loan's] structure, Holifield and his counsel believed that they would keep the transaction on Holifield's 'side of the ledger,' just as Morgan Stanley wanted."); *id.* at 601 ("Holifield and his

54

- "Holifield and his counsel believed—reasonably and in good faith—that they had created a mechanism that did not affect XRI's rights and did not require XRI's approval."[91]

- Holifield and his lawyers "believed—again reasonably and in good faith—that XRI and its controller knew everything that they wanted and needed to know."[92]

- "Holifield and his lawyers believed—also reasonably and in good faith—that XRI and its controller did not want or need to be involved in anything" other than reviewing and signing the documents that they absolutely had to sign. [93]

- "Holifield reasonably believed that the Blue Transfer was acceptable to XRI. Gabriel's deep involvement in the process supported that good faith belief. So did Burt's instruction to keep any capital raise on his side of the ledger. So did Gabriel's execution of the Blue Pledge. So did XRI's failure to take any action after receiving full information about the Assurance Loan."[94]

---

counsel believed—reasonably and in good faith—that they had created a mechanism that did not affect XRI's side of the ledger.").

[91] *Id.* at 604. The finding that the mechanism "did not require XRI's approval" was an overstatement, because Gabriel did have sign off on certain documents.

[92] *Id.* at 590; *accord id.* at 602 ("Acting in good faith, Holifield and his counsel made a reasonable decision not to include information that they believed would slow down the transaction, but ultimately not affect the deal's structure.").

[93] *Id.* at 590; *accord id.* at 601 (finding that Holifield and his counsel "believed, based on Burt's comment to Holifield, that Morgan Stanley did not want XRI to be involved in Holifield's efforts to raise capital" and that "[a]cting in good faith, Holifield and his counsel made a reasonable decision not to include information that they believed would slow down the transaction, but ultimately not affect the deal's structure."); *id.* at 604 ("[B]ased on Burt's comment to Holifield about keeping any transaction on his side of the ledger and Gabriel's comment about XRI not wanting to sign any documents that XRI was not required to approve, they believed—reasonably and in good faith—that Morgan Stanley did not want XRI to be involved in any capital-raising efforts by Holifield, unless its approval was contractually required. Holifield and his counsel made a good faith decision not to provide documents to XRI that they believed XRI did not want or need to see.").

[94] *Id.* at 626.

The *Post-Trial Opinion* did not find that Holifield and his lawyers believed that the Blue Transfer and Assurance Loan complied with the No Transfer Provision. They believed that XRI would not object to those transactions as long as there was no direct pledge of the units themselves and Holifield kept all of the risk that was associated with the loan.

For purposes of the Disabling Conduct proviso in the Indemnification Provision, Holifield breached the No Transfer Provision willfully. He is charged with knowing the terms of the LLC Agreement, and he knew that the Blue Transfer and Assurance Loan violated the No Transfer Provision, not only because it failed the No Consideration Requirement but also because he was not engaging in estate planning. The lawyer who helped Holifield document the Assurance Loan must have known that the Assurance Loan violated the No Transfer Provision. They did not believe that the Blue Transfer and Assurance Loan complied with the letter of the LLC Agreement. They were banking on their understanding that Gabriel and Morgan Stanley were aware of what they were doing and did not object.

### 2. The Breach Of The No Encumbrance Provision

As its second basis for recoupment, XRI contends that by securing the Assurance Loan, Holifield engaged in conduct that constituted a grossly negligent or willful breach of the No Encumbrance Provision. The Delaware Supreme Court directed the court to address the No Encumbrance Provision "if on remand the Vice Chancellor concludes that Holifield's actions in breaching the No Transfer Provision

did not amount to Disabling Conduct."[95] The court has found that Holifield's actions in breaching the No Transfer Provision amounted to Disabling Conduct, making it unnecessary to evaluate the No Encumbrance Provision. The parties agree that the court need not reach this issue in that scenario.[96]

## C.    The Amount Of Recoupment

XRI seeks recoupment of expenses advanced to Holifield. Through November 30, 2023, the amount advanced was $1,969,791.50. Since then, XRI has advanced additional amounts. The parties will confer on a figure to include in the final order.

## III.    CONCLUSION

The Delaware Supreme Court remanded this case for the trial court to determine the amount of XRI's damages for breach of the LLC Agreement, whether XRI could recoup expenses advanced to Holifield, and the amount of the recoupment.

This decision holds that (i) XRI can recover $4.1 million as damages for breach of the LLC Agreement, (ii) Holifield engaged in Disabling Conduct that entitles XRI to recoup the expenses advanced to Holifield for this litigation, and (iii) the amount

---

[95] *Supr. Ct. Op.*, 304 A.3d at 938.

[96] *See* Plaintiff's Opening Brief on Remand at 30 n.7 ("If the Court determines that XRI is entitled to recoup the entirety of the fees advanced to Holifield based on Holifield's Disabling Conduct in connection with the No Transfer Provision, then the Court would not need to reach the No Encumbrance Provision.  In that case, a finding of breach and Disabling Conduct as to the No Encumbrance Provision would again 'not affect the outcome of the case.'").

of recoupment consists of $1,969,791.50 as of November 30, 2023, plus any expenses advanced since then.

The parties will confer on a form of final order that will bring this action to a close at the trial court level.